ARGUED SEPTEMBER 20, 2021
PANEL DECISION ENTERED AUGUST 16, 2022

Case Nos. 20-5183 & 20-5208
_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**LISA GUFFEY** and **CHRISTINE SMITH**,

*Plaintiffs-Appellees/*
*Cross-Appellants*,

v.

**ROSLYNN R. MAUSKOPF**, in her official capacity as
Director of the Administrative Office of the United States Courts,

*Defendant-Appellant/*
*Cross-Appellee*.

_____

Appeal from the U.S. District Court for the District of Columbia
(No. 1:18-cv-01271)
_____

**OPPOSITION TO PETITION FOR REHEARING EN BANC**

Scott Michelman
Arthur B. Spitzer
Laura K. Follansbee
American Civil Liberties Union
   Foundation of the District of Columbia
915 15th Street NW, Second Floor
Washington, DC 20005
(202) 601-4267
smichelman@acludc.org

December 9, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

GLOSSARY ...................................................................................... iii

INTRODUCTION ..............................................................................1

ARGUMENT......................................................................................1

    I.     The Panel Correctly Understood The "Public Perception" Interest As An Interest In The Perception Of Judges' Ability To Adjudicate Impartially, An Interest From Which AO Employees Are Wholly Removed. .............3

    II.    The Panel Did Not Err In Considering The Absence Of Even One Instance Of Damage To The Judiciary From AO Employees' Political Speech. ...................................................................................7

    III.   Similarities To The Unchallenged Courthouse Code Do Not Render The AO's Challenged Code Constitutional. ..................................................10

    IV.   The Panel Correctly Concluded That The Public Perception Interest Does Not Justify The Driving And Organizing Restrictions...........................11

    V.    The Panel Rightly Rejected The Government's Attempt To Justify Its Broad Speech Ban Based On The Possibility That Judges Would Lose Confidence In The AO..........................................................................13

CONCLUSION .................................................................................17

CERTIFICATE OF WORD COUNT...................................................18

i

# TABLE OF AUTHORITIES

*\*Authorities upon which we chiefly rely are marked with asterisks.*

## Cases

*Janus v. Am. Fed'n of State, Cty., & Mun. Employees*,

    138 S. Ct. 2448 (2018) .................................................................2

*Keeffe v. Library of Congress*, 777 F.2d 1573 (1985)............................................15

*McCutcheon v. FEC*, 572 U.S. 185 (2014).....................................................16

*Mistretta v. United States*, 488 U.S. 361 (1989) ...................................................3, 4

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000) ..........................................2

*Pickering v. Board of Education*, 391 U.S. 563 (1986) .........................................12

*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) ......................................................16

*\*United States v. Nat'l Treasury Employees Union*,

    513 U.S. 454 (1995)...................................................... 1, 2, 5, 12, 13, 14, 16

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*,

    413 U.S. 548 (1973) .............................................................11, 12

*Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015).......................................................8

*\*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015)........................................2, 3

## Rules and Regulations

Fed. R. App. P. 35................................................................................................1

## Secondary Sources

Cong. Res. Serv., *Is Mandatory Detention of Unlawful Entrants Seeking Asylum Constitutional?* (Jan. 27, 2021),

https://crsreports.congress.gov/product/pdf/LSB/LSB10343 ................................15

www.noaa.gov ...................................................................................................10

www.uscourts.gov/topics/administrative-office-us-courts....................................10

## GLOSSARY

| | |
|---|---|
| AO | Administrative Office of the United States Courts |
| CRS | Congressional Research Service |
| EPA | Environmental Protection Agency |
| IRS | Internal Revenue Service |
| JA | Joint Appendix |
| NOAA | National Oceanic and Atmospheric Administration |
| *NTEU* | *United States v. Nat'l Treas. Employees Union*, 513 U.S. 454 (1995) |

## INTRODUCTION

The panel opinion ("Op.") correctly concluded that Plaintiffs' First Amendment freedom to engage in political activities at the heart of the democratic process outweighs the government's conjectural fear that the public (and even judges themselves) will lose faith in the political neutrality of the Administrative Office of U.S. Courts ("AO") if its employees are permitted to engage in common political conduct, most of which the AO permitted for eight decades without issue.

Rehearing en banc is disfavored unless "necessary to secure or maintain uniformity of the court's decisions" or the case "involves a question of exceptional importance." Fed. R. App. P. 35(a)(1)-(2). The government does not (and cannot) argue that the panel decision conflicts with circuit precedent; it argues only that the issue is exceptionally important. Although the AO's speech restrictions strike deep into Plaintiffs' First Amendment rights, and therefore raise an important issue, the panel's well-reasoned decision applied the correct standards to reach the correct, common-sense result. Rehearing en banc is thus unwarranted.

## ARGUMENT

Because broad *ex ante* restrictions such as the AO's revised Code "chill[] potential speech before it happens," the government "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary

1

impact on the actual operation of the Government." *United States v. Nat'l Treas. Employees Union*, 513 U.S. 454, 468 (1995) ("*NTEU*") (cleaned up). This standard places a "heav[y] burden" on the government that resembles "exacting scrutiny." *Janus v. Am. Fed'n of State, Cty., & Mun. Employees*, 138 S. Ct. 2448, 2472 (2018). Courts "have never accepted mere conjecture as adequate to carry a First Amendment burden," *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000), as the panel recognized, Op. 8.

The panel faithfully applied the *NTEU* standard and correctly concluded that none of the interests the government identified in support of its restrictions on employee speech outweighed Plaintiffs' interests in exercising their core First Amendment rights. Op. 6-15. Following Supreme Court precedent, the panel understood that the government's asserted interest in the "public perception" of the judiciary is in the perception of *judges*' ability to *adjudicate* fairly. *Id.* at 9-10 (discussing *Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015)). The panel accurately discerned that the government's "evidence" regarding that interest here was not evidence at all, but unrealistic speculation combined with conflation of AO employees with judges. *Id.* at 10-13. The panel also recognized as implausible the government's speculation that, absent its drastic political speech restrictions, Congress would lose confidence in the AO (an argument the government does not even press on rehearing) or that judges would do so. *Id.* at 13-15. And the panel

rightly concluded that all nine of the challenged speech restrictions should rise or fall together, as they all "implicate core First Amendment rights" without posing "any non-speculative threat" to the AO's operations. *Id.* at 16.

The petition's objections to the panel's decision are unavailing.

## I.   The Panel Correctly Understood The "Public Perception" Interest As An Interest In The Perception Of Judges' Ability To Adjudicate Impartially, An Interest From Which AO Employees Are Wholly Removed.

As the Supreme Court has explained, the government's interest in the public perception of the judiciary stems from its need to "assure its people that *judges* will *apply the law* without fear or favor." *Williams-Yulee*, 575 U.S. at 438 (emphasis added). The panel rightly rejected the government's attempt—which it resurrects here, Pet. 13—to stretch this interest to cover the administrative work of AO employees. Op. 9-10. It is judges' special role as impartial adjudicators, which traces back to the Magna Carta, that justified the Supreme Court's decision in *Williams-Yulee* to recognize a "rare case[] in which a speech restriction withstands strict scrutiny." 575 U.S. at 444.

The government's invocation of *Mistretta v. United States*, 488 U.S. 361 (1989), to try to broaden the public perception interest to the judiciary's non-adjudicative functions, is unavailing. There, the Court concluded that federal judges' participation in the "making of policy" as members of the U.S. Sentencing Commission did not "undermine[] public confidence in the disinterestedness of the

3

Judicial Branch." *Id.* at 407. In so concluding, *Mistretta* did not undertake to catalogue what does or doesn't threaten that perception or specify the nature of the public perception interest. *Williams-Yulee* did. *Mistretta* in no way conflicts with *Williams-Yulee* because it did not speak to the same question—i.e., what the interest in the perception of judicial integrity is all about. The panel correctly identified the Supreme Court case on point and correctly applied it.

Relatedly, the government's petition repeats its error, persuasively rejected by the panel, of conflating AO employees with judges. Unlike the judges serving on the Sentencing Commission, AO employees have no role in the adjudication of cases. Although a subset of AO employees "[a]dvise judges on reimbursements, recusals, gifts, and other ethics issues," Op. 3, none "make[s] recommendations about the outcomes of individual cases." *Id*.

Because of this distance between AO employees and the root of the public perception interest—impartial adjudication—the hypotheticals the government has posited throughout this litigation, in which the public perception of the judiciary would be damaged if members of the public become aware of AO employees' personal political activities, require several unrealistic leaps. As the panel explained, the public would first need to become aware of the AO's existence, then become aware of individual AO employees' political conduct, and finally, "lose confidence

in judges' adjudication of cases because those employees support a particular candidate on their own time." Op. 10.

This chain of inferences requires the government to conjure a perfect storm of specific knowledge and specific *mis*understandings on the part of the public: possessing awareness of the AO and its employees' private political conduct, but at the same time fundamentally misunderstanding AO employees' role in adjudication (which is none). Even if bad actors sought to portray AO employees' run-of-the-mill political activities in a nefarious light, as the Director fears, Pet. 11-12, there is no reason to believe that their attempts would be persuasive, damaging, or common. Simply put, the government's fears are "implausible." Op. 10.

The panel was also right to reject the government's attempt to carry its "heavy" burden, *NTEU*, 513 U.S. at 466, by pointing to controversies involving employees of agencies *other* than the AO. *See* Op. 11-12 (rejecting analogy between AO employees and investigators in the office of Special Counsel Robert Mueller). The government now argues that political inquiries into IRS employees' political donations shows that employees with little policy influence are likely targets. Pet. 14. But as government agencies go, the IRS is a household name. Nothing in the record (or out of it) suggests that the public is aware of the AO at all. Op. 10. It simply does not follow that because IRS employees were targeted, AO employees

will be—or that members of the public would change their views of the judiciary if they were.

The Director's tries to bring the concern closer to home by invoking an incident where "the Judiciary" was targeted, Pet. 12, but "the Judiciary" is not a monolith. What the petition does not mention is that the incident it references involved criticism of federal *judges*' role on a committee that drafted an advisory opinion prohibiting other *judges* from maintaining membership in the Federalist Society and the American Constitution Society. *See* Gov't Opening Br. 36-37, *cited in* Pet. 12. Because AO employees remain several steps removed from the adjudicative function that requires impartiality, it is not realistic to assume they would be targeted or that any concocted story about them would do substantial damage to the judiciary's reputation. "That is why," as the panel pointed out in rejecting the government's argument about the controversy regarding judges' memberships, "criticism of the committee's guidance focused on the judges' backgrounds, not the AO employees who assisted them." Op. 12. Finally, the government's reliance on polling showing a general decline in confidence in the judiciary, Pet. 11, does not move the needle, as it is totally unconnected to the AO— of which the public is likely unaware. *See* Op. 10.

In sum, the government's attempt to paper over the implausibility of its theory by conflating AO employees with judges cannot suffice to carry its "heavy" burden

under *NTEU*. And a conjectural risk of an AO-specific disinformation campaign conducted by a malicious political operative cannot justify a total prohibition on 1100 Americans' exercise of nine core First Amendment rights.

## II. The Panel Did Not Err In Considering The Absence Of Even One Instance Of Damage To The Judiciary From AO Employees' Political Speech.

In considering whether the Director's invocation of the public perception interest was persuasive, the panel took note that the AO could not find even one "instance of off-duty political conduct by an AO employee that has injured the Judiciary's reputation." Op. 10.

The government caricatures the panel opinion as requiring the government to "wait for grave harm to occur before acting to avert it." Pet. 13. On the contrary: the panel sensibly recognized no more than that the absence of past harm is probative of the implausibility of future harm, *see* Op. 10 (characterizing this history as "strong evidence"), particularly when much of the conduct the AO now seeks to prohibit was permitted in the past. If drinking a cup of coffee with dinner has never disturbed my sleep in the past, it is reasonable to conclude that a coffee with dinner today probably won't keep me up tonight.

Accordingly, it is telling that, going back eight decades, the government cannot find a single instance of AO employee conduct that damaged the public's perception of the judiciary. The government's contention that these are

circumstances in which "'we would not expect to find . . . evidence' of harm," Pet. 14 (quoting *Wagner v. FEC*, 793 F.3d 1, 14 (D.C. Cir. 2015) (en banc)), rests on the proposition that most of the restricted activities "had already [been] prohibited . . . for approximately two decades." *Id*. But that is a gross exaggeration. Prior to the Code at issue here, AO employees were permitted to engage in a broad range of political activities while off duty. Employees could join political parties, publicly express opinions on political issues, make political donations, attend partisan fundraisers, wear political paraphernalia, sign nominating petitions, and act as poll watchers for a candidate or party. JA 83-86 (2016 AO Code of Conduct § 260(a)(2)(A), (b)(1), (c)(1)-(4), (e)(1)). For local and state campaigns (but not federal ones), AO employees could endorse or oppose political candidates, drive voters to the polls on behalf of a partisan actor, or organize fundraisers. *Id.* § 260(c)(8) & (10), (e)(2)(C). (Of course, AO employees were prohibited from engaging in political activities while "on duty" or in connection with their jobs, *id.* § 260(a)(4)-(5)—restrictions with which Plaintiffs take no issue.)

Even more probative is the lack of harm during the past four-plus years, when the AO was enjoined from enforcing seven of its nine restrictions (all but the prohibitions on driving voters to the polls on behalf of a party and organizing partisan events). Were harm to the judiciary's reputation likely to occur because of AO employees' political activity, one would expect to find evidence of at least one

8

troubling instance where the government fears it most: "in this environment," Pet. 11—meaning the current political and social-media climate—including the 2018 congressional elections and the 2020 presidential election.

In fact, the only non-speculative evidence the AO presented included congressional staffers' *positive* assessments of the AO's impartiality *prior* to the creation of the Code at issue here. *See* Cooney Decl., JA 164 ¶ 10 ("[T]he perception was that the AO consistently and reliably presented views that were solely in the best interest of the courts, without allowance for political considerations."); Weich Decl., JA 177 ¶ 12 ("In my experience as a congressional staffer, the AO and its employees were uniformly perceived as non-partisan actors advocating on behalf of the federal Judiciary."). It is of no moment that these declarants are also "aware of firms whose business models include the dissemination of [negative] political information." Pet. 12 (citation and internal quotation marks omitted). The Director simply cannot explain why Russian propagandists or opposition-research firms would choose to focus their efforts on a small, obscure administrative office rather than politicians and institutions that are either well-known to the public (like the

IRS) or at the forefront of some of the most contentious issues in modern politics (like climate change).[1]

### III. Similarities To The Unchallenged Courthouse Code Do Not Render The AO's Challenged Code Constitutional.

The Director also argues that the challenged Code must be constitutional because the code that applies to courthouse employees contains identical prohibitions and was approved by federal judges. Pet. 1, 16. The government's argument fails for two reasons.

First, the Director created no record regarding the similarities and differences between courthouse and AO employees. As a result, there is no basis to infer that whatever restrictions would be justified as to courthouse employees would be justified as to AO staff.

Second, although no court has invalidated the Courthouse Code, no court has upheld it, either. Accordingly, the Courthouse Code it not a useful reference point for the constitutionality of similar restrictions. Nor does the fact that judges were

---

[1] *Cf. id.* (discussing the EPA and NOAA). NOAA is probably not as well-known as the EPA. But in terms of its role in major national controversies, consider that as of this filing, NOAA's homepage *www.noaa.gov* links to five articles, one of which is titled "U.S. hit with historic snowfall, late-season hurricane in November," and another that discusses funding for "coastal resilience" to "help communities prepare for increasing coastal flooding and more intense storms" resulting from a "changing climate." The AO's homepage, by contrast, links to articles about court caseloads and statistics, former Director James Duff, e-discovery, court employees honored, and the American Judicature Society. *See* www.uscourts.gov/topics/administrative-office-us-courts.

involved in the Courthouse Code in a policy-making capacity mean that it would necessarily withstand a constitutional challenge. At the time that a committee of judges approved the Courthouse Code in their administrative capacity, they were not presented with a First Amendment challenge to its constitutionality. Judges' approval of an administrative policy is simply not the same as an adjudication of constitutionality following testing through the adversarial process.

## IV. The Panel Correctly Concluded That The Public Perception Interest Does Not Justify The Driving And Organizing Restrictions.

The panel understood that the same logic applies to all nine proposed restrictions and that the Supreme Court's decision in *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548 (1973) ("*Letter Carriers*"), which upheld driving and organizing restrictions in the Hatch Act, did not control here. Op. 15-16. And "[a]bsent the belief that precedent directs it, there is no reason to treat driving voters to the polls and organizing political events differently from the other seven prohibited modes of political expression." *Id.* at 16. Just like the other seven, the possibility that AO employees' engagement in these activities will damage the judiciary's reputation is remote and requires a chain of speculative leaps. *See* Part I. Even the panel dissent (at 2 n.3) saw no reason to treat any of the prohibitions differently, agreeing with the majority that "all nine rise or fall together."

The government's arguments that *Letter Carriers* justifies the driving and organizing restrictions, Pet. 18, are unavailing. As the panel observed, *Letter*

*Carriers* relied heavily on the government's need to protect executive branch employees from "pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs." 413 U.S. at 565-67. While *Letter Carriers* also referenced the public perception interest, the political-pressure concern drove its analysis. *See id.* As the panel explained, "the Hatch Act's restrictions passed muster because they 'aimed to *protect* employees' rights, notably their right to free expression, rather than to restrict those rights.'" Op. 16 (quoting *NTEU*, 513 U.S. at 471). The government offers no comparable justification here.

Moreover, "[s]weeping statutory impediment[s] to speech," such as those at issue here, are evaluated under a more stringent standard today than they were when *Letter Carriers* was decided. *See NTEU*, 513 U.S. at 467. In *Letter Carriers*, the Court applied the *Pickering* framework, which requires only that a court balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern" against "the interest of the [government], as an employer, in promoting the efficiency of the public services it performs." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Since then, the Supreme Court has promulgated the more protective *NTEU* standard applicable to broad *ex ante* restrictions. In *NTEU*, the Court held that when advancing a far-reaching prospective restriction with the potential to chill substantial speech, the government must meet a considerably higher standard and

12

"show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." 513 U.S. at 468 (cleaned up). The panel rightly recognized that, today, *NTEU* provides the governing standard. Op. 6-7. The government agrees. *See* Pet. 10.

The panel was correct to distinguish *Letter Carriers* and treat all nine restrictions together, as even the dissent agreed was appropriate.

## V. The Panel Rightly Rejected The Government's Attempt To Justify Its Broad Speech Ban Based On The Possibility That Judges Would Lose Confidence In The AO.

The panel perceived that the government's concern about judges' loss of confidence in AO employees because of their political activities was a concern limited, at most, to the "30 or so employees who advise judges on sensitive matters like recusals and participation in outside activities." Op. 14. Accordingly, the government's interest, even if credited, could not justify the broad sweep of the AO's speech code to all 1100 of its employees. *Id.* at 14-15. Further, the panel quite reasonably "doubt[ed] the foundation of the AO's predicted harm," especially given the AO's own recognition that "its employees . . . perform[] 'their job duties and tasks without regard for partisan considerations.'" *Id.* 15 (quoting the district court's

opinion, in turn quoting the AO's Statement of Material Facts at summary judgment).

The government contends that the panel should have taken its concerns about the political partisanship of *all* its employees more seriously, Pet. 15, but it provides no good reason to do so in the face of its own positive opinion of its employees' impartiality. As with the public perception interest, there is no evidence that federal judges' high regard for the AO as politically neutral has been threatened by AO employees' off-the-clock exercise of their First Amendment rights. As noted, eighty years of experience, including the last four with the bulk of the AO's restrictions enjoined, suggest the contrary.

Indeed, even if a judge were to become aware of an employee's political inclinations, there is no reason to think it would color the judge's perception of the employee's work product. In fact, some of judges' closest advisors—law clerks— routinely include prior partisan or ideological affiliations or activities in clerkship applications, and yet judges rely on their clerks' research when resolving cases. This is likely because of "'the powerful and realistic presumption that the federal work force consists of dedicated and honorable servants,'" Op. 15 (quoting *NTEU*, 513 U.S. at 476), in addition to judges' confidence in their own abilities to independently evaluate the advice they are given. There is no reason judges would not respond the same way were they to become aware of an AO employee's run-of-the-mill political

14

activity. A contrary assumption requires that judges be a very particular degree of gullible: easily susceptible to being duped by scheming AO employees with partisan agendas yet also easily reassured that AO employees could not possibly be up to any partisan scheming as long as they don't post partisan Facebook messages or contribute to political campaigns.

*Keeffe v. Library of Congress*, 777 F.2d 1573, 1580 (1985), affords the Director no help. First, *Keeffe* was decided prior to *NTEU*, which heightened the burden on the government to justify broad *ex ante* speech restrictions like those here. *See* Part IV. Second, the work of the Congressional Research Service ("CRS") analysts in *Keeffe* is much more analogous to the substantive advice offered by law clerks than to the work of most, if not all, AO employees. CRS analysts are tasked with providing congressional staff with non-partisan research and analysis on legislative proposals, *Keeffe*, 777 F.2d at 1574-75, including assessments of controversial questions, *see, e.g.,* Cong. Res. Serv., *Is Mandatory Detention of Unlawful Entrants Seeking Asylum Constitutional?* (Jan. 27, 2021).[2] They therefore routinely assess the substance of partisan proposals while "work[ing] equally for *all* Congress[members] and Senators," *Keeffe*, 777 F.2d at 1580—a role that draws much more heavily on their ability to be and appear personally impartial than the work of AO employees. The panel could not assess the possibility that "employees

---

[2] *Available at* https://crsreports.congress.gov/product/pdf/LSB/LSB10343.

who do different jobs than Guffey and Smith should be subject to different restrictions" on the record before it, Op. 17, but at the very least, it is clear that the work of CRS analysts is a far cry from that of the vast majority of AO employees, who (like Plaintiffs Guffey and Smith) come in contact with judges only to advise on administrative matters like cybersecurity and budgetary matters.

Finally, the government complains that the panel's concern about the fit between a speech restriction affecting 1100 people and a government interest relevant to (at most) 30 is misplaced because "the Judicial Conference has not taken this type of case-by-case approach in the Courthouse Code; nor has the Supreme Court or this Court required it under the Hatch Act." Pet. 17. This argument is flatly contrary to binding precedent, which requires that an *ex ante* speech restriction be "a reasonable response to the [government's] posited harms." *NTEU*, 513 U.S. at 476-77. Accordingly, just like the panel here, this Court has found "the obvious lack of 'fit' between the government's purported interest and the sweep of its restrictions" to be of "[f]oremost" concern in an *NTEU* analysis. *Sanjour v. EPA*, 56 F.3d 85, 95 (D.C. Cir. 1995) (en banc); *see generally McCutcheon v. FEC*, 572 U.S. 185, 218 (2014) (plurality opinion) ("In the First Amendment context, fit matters. Even when the Court is not applying strict scrutiny, we still require a fit that is not necessarily perfect, but reasonable[.]" (cleaned up)). Thus, the panel was quite right to be

16

concerned with the breadth of the government's ban, regardless of whether other regulations, not before the Court here, take a "case-by-case approach."

Fundamentally—here and throughout its analysis—the panel was correct to hold that the First Amendment does not permit the government to ban so much political speech and association based on so little justification.

## CONCLUSION

The petition should be denied.

December 9, 2022

Respectfully submitted,

*/s/ Scott Michelman*
Scott Michelman
Arthur B. Spitzer
Laura K. Follansbee
American Civil Liberties Union
   Foundation of the District of Columbia
915 15th Street NW, Second Floor
Washington, DC 20005
(202) 601-4267
smichelman@acludc.org

*Attorneys for Plaintiffs-Appellees/Cross-Appellants Guffey and Smith*[3]

---

[3] Counsel wish to acknowledge the assistance of paralegal Elaine Stamp in the preparation of this brief.

## CERTIFICATE OF WORD COUNT

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 35(e) for a response to petition for en banc consideration, because it contains 3,865 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface (Times New Roman 14-point type) using Microsoft Word.

*/s/ Scott Michelman*
Scott Michelman